FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
'20 JAN 12 PM 1: 20

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ALEXANDER BANNERMAN      *

Petitioner      *

v      *     Civil Action No. JFM-15-42

WARDEN J. M. STOUFFER and      *
THE ATTORNEY GENERAL OF THE
STATE OF MARYLAND      *

Respondents      *
                 ***

## MEMORANDUM

In answer to the above-entitled petition for writ of habeas corpus, respondents assert that the petition should be denied on its merits. ECF 13. Petitioner Alexander Bannerman filed a reply to the response. ECF 14. Upon review of the pleadings filed, the court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2016); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For the reasons that follow, the petition shall be denied and a certificate of appealability shall not issue.

### Background

Facts produced at trial

Bannerman was tried before a jury in the Circuit Court for Baltimore City with Judge John Prevas presiding. The voir dire process for choosing the jury utilized groups of questions put to the entire array with instructions to those who had an affirmative answer to the question to stand and approach the bench to provide that answer. The first group of questions was designed to determine whether the potential jurors knew the parties, court staff, counsel, police officers or anyone else involved in the case and also addressed whether jurors had a racial bias, their

religion prohibited judgment of another, and whether their knowledge or lack of knowledge of firearms would prevent them from considering evidence in a neutral fashion. ECF 13 at Ex. 2, pp. 17 – 19. The second group of questions asked jurors if they lived near the crime scene; if they had ever served on a jury; and whether they possessed an inability to vote guilty or not guilty in their capacity as a juror. *Id.* at pp. 45 – 46. Potential jurors were then asked if they would automatically believe or disbelieve witnesses who were members of law enforcement or who otherwise testified for the state or for the defense; and also asked if jurors had an affiliation or had a relative who was in law enforcement, including correctional officers and staff. *Id.* at pp. 80 – 81. Finally, jurors were asked if they had any other issue that would affect service such as serious scheduling issues. *Id.* at pp. 118 – 20. The process of eliminating jurors for cause took place after all the questions were asked; counsel were required to respond to the judge's inquiry regarding each juror's potential for excuse for cause at the end of the entire process. The jury was then seated with three alternates.[1]

The first witness put on by the State was David Mitchell, the victim of the shooting. ECF 13 at Ex. 2, pp. 164 – 219. Mitchell testified that he went to J & J Discount Liquors on the night of November 9, 2007, with his cousin, Quaisi[2] (aka, Dante) Sutton, and a friend of the family, Thomas Royster. While Mitchell was in the store with his two companions, two men walked into the store. One of the men, who was wearing a bandana covering the lower half of his face, was holding a handgun and told everyone to get on the floor when he came into the store. *Id.* at pp. 169 – 70. Mitchell said that no one got on the floor and the gun was pointed at him. *Id.*

---

[1]     After the jury was seated and the first witness had testified, juror #2 was excused from service because she spoke to the prosecuting attorney in the hallway, complaining about being required to serve as a juror when she had no daycare for her children. An alternate was seated in her place. ECF 13 at Ex. 3, pp. 9 – 10.

[2]     Also spelled "Kwiesi" in the transcript.

Mitchell said he did not move as he felt panicked and he surmised that it made the shooter angry when no one got on the floor. *Id.* Mitchell was then shot in the upper part of his legs and passed out shortly after being shot, but noticed that his two companions left the store after the shooter left. *Id.* at pp. 170 – 71. When Mitchell briefly regained consciousness, he saw a police officer leaning over him.[3] *Id.* at p. 174.

Mitchell later told police that he recognized one of the men who came into the store as Orlando Johnson. ECF 13 at Ex. 2, pp. 176 – 78; 188. He testified that he knew Johnson because he lived in the same neighborhood and Johnson had dated Mitchell's ex-girlfriend. *Id.* at pp. 176 – 78. Mitchell could not identify the shooter, however, because the lower half of the shooter's face was hidden by a bandana. *Id.*

Mitchell testified under cross-examination that he did not know whether Johnson was with the shooter or not, but said that Johnson stood behind the shooter, closer to the door during the incident and that it appeared to Mitchell that Johnson could have safely left if he was not involved in the shooting. *Id.* at pp. 200 – 201. Mitchell further stated under cross-examination that Johnson appeared to leave with the shooter. *Id.* at p. 202. He also testified that he was looking at Johnson throughout the incident; that he has known Johnson for approximately four years; and that he knows Johnson to sell cocaine and "dope." *Id.* at pp. 203 – 4. Although Mitchell testified that the shooter was "light skinned" with long hair, in his statement to police he said that the shooter had "cornrows." *Id.* at p. 206. While Mitchell maintained there was no ill-will between himself and Johnson regarding Mitchell's ex-girlfriend, he admitted during cross-examination that it was possible that Johnson thought otherwise. *Id.* at p. 201. On redirect, however, Mitchell explained that the situation regarding his ex-girlfriend had occurred a "couple

---

[3]       Mitchell explained that the bullet destroyed arteries in his right leg and required a transplant of arteries from his left leg to his right. ECF 13 at Ex. 2, p. 174. He also stated he was unable to walk for six to seven months following the injury to his legs. *Id.* at p. 175.

of years" before the shooting. *Id.* at pp. 217-19.

Officer Dathan Garrett was the first police officer to respond to the scene of the shooting; he testified at trial regarding his role in securing medical assistance for the victim and identifying potential witnesses. ECF 13 at Ex. 3, pp. 11 – 25. Garrett explained that upon his arrival Mitchell was lying on the floor, barely conscious, sweating profusely, and bleeding heavily. *Id.* at p. 14. Because of the severity of his injuries, Mitchell was unable to provide any information prior to being transported to the hospital. *Id.* Garrett testified that he asked Quaisi Sutton to stand by for questions and that Sutton, along with three other witnesses, were transported to the police station for questioning. *Id.* at pp. 15-16. When Garrett canvassed the area he located and collected one 9 millimeter shell casing. *Id.* at p. 17. He was later called back to the scene to collect a bullet fragment found on the floor in the store. *Id.* at p. 18. Garrett also confirmed that the store had a video surveillance system inside the store. *Id.* at p. 41.

Through cross-examination of Garrett it was established that Sutton, who had accompanied Mitchell to the store, had described the shooter as a black male who was approximately 5'9" tall and 160 pounds, wearing a blue and white scarf over his face. ECF 13 at Ex. 3, pp. 29 – 30. Garrett stated that Sutton informed him that he could not see the shooter's hair and did not describe it. *Id.* at p. 34. Garrett also confirmed that nothing had been taken from any of the people who had been in the store at the time of the shooting. *Id.* at p. 35.

The witness for the state who testified regarding the transfer of the store's video surveillance footage from VHS format to digital was Officer Laylla Strand from the Media Production Unit of the Baltimore Police Department. ECF 13 at Ex. 3, pp. 43 – 92. Strand testified that she was trained in forensic video examination and the presiding judge advised that the State's Attorney had to offer Strand as an expert witness based on Maryland case law that

requires the use of an expert witness to introduce any scientific evidence. *Id.* at pp. 47 – 48. The suggestion that Strand should be qualified as an expert witness drew an objection from defense counsel because Strand was not listed as an expert witness by the State in pre-trial disclosure documents. *Id.* After hearing argument as to whether the State had complied with Maryland Rule 4-263, regarding discovery in a criminal trial, the court overruled the objection by defense counsel. The court observed that while the State had not formally complied with the rule, the nature of the expert's opinion is "so basic and so patently clear" that identification of Strand and of the subject matter would lead the defense to the "inescapable conclusion that she would explain to the jury how she got the store videotape to CD format." *Id.* at pp. 52 – 54. Defense counsel moved for a continuance and for a mistrial on the grounds that the State failed to comply with discovery; both motions were denied but the court granted the defense 48 hours at the close of the State's case to locate an expert witness for rebuttal. *Id.* at pp. 55 – 56. Defense counsel then objected to Strand being admitted as an expert witness for lack of a proper foundation because there had been no questions about slowing down a videotape to make the playback real time speed. *Id.* at pp. 65 – 66. Counsel further argued that simply providing the defense with 48 hours to locate its own expert witness violates the defendant's due process rights. *Id.* The court overruled counsel's objection on the foundational requirements and accepted Strand as an expert witness. *Id.* at pp. 67 – 78.

Strand testified that she received the videotape from Detective Bennett who asked for the tape to be slowed down and for images to be extracted for still photographs. ECF 13 at Ex. 3, pp. 81 – 82. Strand explained that the surveillance video was recorded on a VCR type of machine and the playback was at a faster than real time speed, making it difficult to discern what was happening in each frame of the tape. *Id.* The portion of the VHS tape of interest to the case

was approximately one minute long; Strand slowed down the speed of playback and transferred the video to digital media, which was identified and entered into evidence over the objection of defense counsel. *Id.* at pp. 83 – 85. The video of the shooting was then played for the jury (*id.* at p. 86) and the still photographs pulled from the video were published to the jury. *Id.* at pp. 87 – 89. Strand testified that no changes were made to the still photographs, but that the images were enhanced using the application "Photoshop." *Id.* at p. 89. On cross-examination Strand clarified that "enhancement" of an image does not change it; rather, it is similar to turning on a light in a darkened room. *Id.* at p. 94.

Initially the court overruled a defense objection to the introduction of video footage from a CCTV camera, stationed outside of the liquor store and operated by the city of Baltimore, through Strand. ECF 13 at Ex. 3, p. 92. The court subsequently reversed its ruling and noted that Strand did not work on the CCTV footage. *Id.* at p. 98 – 99. The court noted that there had been no harm to the defense because Strand had not testified as to the content of the CCTV footage. *Id.* at p. 100.

Keith James was working as a stock clerk at J&J Discount Liquors on the night of the shooting and testified for the state at trial. ECF 13 at Ex. 3, pp. 139 – 165 (direct); pp. 166 – 188 (cross-examination); pp. 118 – 226 (redirect and re-cross). James testified that three men came into the store near closing time to buy liquor and they walked to the window and placed an order. *Id.* at pp. 142 – 3. He stated that a "minute or two later" two other men came into the store but not all the way in. *Id.* He claimed that one of the two men said, "kick it out, kick it all the way out" after coming into the doorway. *Id.* James recalled that immediately after making that statement, the man holding the handgun shot Mitchell. *Id.* at p. 143. James related that he assumed the statement made was a statement made to indicate that a robbery was taking place

and said he was unsure whether the robbery was focused on the store or the customers inside it. *Id.* at p. 144. Over objection from defense counsel, James identified Bannerman as the gunman he saw in the store that night. *Id.* at p. 145.

James was transported to the police station after the shooting, but did not provide police with a description of the shooter when he was initially questioned. ECF 13 at Ex. 3, p. 148. At a second more lengthy interview, James identified Bannerman in a photographic array as the man who shot Mitchell. *Id.* at p. 153. James further testified that the shooter was wearing a blue and white bandana over his face when came into the store. *Id.* at p. 159. He explained that he had seen Bannerman around the neighborhood about a dozen times prior to the shooting and that he had no problems with Bannerman. *Id.* at pp. 160 – 61. For a second time, the surveillance video from inside the store was played for the jury while James described and identified what he saw depicted in the video. *Id.* at pp. 162 – 64.

During cross-examination of Keith James it was established that he was a drug addict who had been arrested on a frequent basis, but possession charges against him that had been pending around the time he spoke with police about this case were nolle prossed. ECF 13 at Ex. 3, pp. 169 – 88; p. 222. James admitted that he did not tell police the first or the second time he was interviewed that he had seen Bannerman around the neighborhood and that he could not see most of the shooter's face during the incident. *Id.* at pp. 170 – 71. On redirect it was established that James identified Bannerman by his eyes and that he claimed his familiarity with Bannerman made him recognizable even though his face was partially covered. *Id.* at pp. 211 – 219.

Orlando Johnson, the man who allegedly walked into J&J Discount Liquors with Bannerman on the night of the shooting, testified for the State. ECF 13 at Ex. 4, pp. 22 – 61 (direct testimony). He explained he knew Bannerman because they had grown up together and

on the night of the shooting he saw Bannerman walking down the street and offered him a ride. *Id.* at pp. 24 - 26. Johnson said that he drove Bannerman to J&J, parked in front of the store, and followed Bannerman into the store. He claimed that he did not see Bannerman pull the bandana up over his face on his way into the store because he was walking behind him. *Id.* at pp. 25 – 26. According to Johnson, once inside the store Bannerman pulled out a gun and told the people in the store, "you know what this is." *Id.* at p. 27. Johnson characterized Bannerman's actions as a robbery attempt. *Id.* Johnson testified that the victim, David Mitchell, told Bannerman he didn't have anything and that is when Bannerman shot him in the leg. *Id.* at pp. 27 – 28.

Immediately following the shooting, Johnson testified that he left and got into his car. *Id.* at p. 28. Bannerman followed Johnson and got into the car with him. *Id.* Johnson told the jury that he drove a few blocks with Bannerman in the car but then stopped the car and told Bannerman to get out of the car and that he wanted nothing further to do with him. *Id.* at p. 28. Johnson claimed he did not know that Bannerman had a gun until he pulled it out inside the store. *Id.* at p. 29. Johnson stated he also knew Mitchell, but did not think Bannerman knew him and had never seen the two men together. *Id.* at pp. 31 – 33. The surveillance video was played during Johnson's testimony and Johnson identified himself as well as Bannerman in the video. *Id.* at p. 34. Johnson stated that he believed Bannerman shot Mitchell because Mitchell did not have anything to give him when Bannerman attempted to rob him. *Id.*

In exchange for his testimony during Bannerman's trial, Johnson pled guilty to first degree assault. *Id.* at pp. 54 – 56. The plea agreement specified that Johnson would receive a sentence of 18 years with all but 4 years suspended, followed by 5 years of probation. *Id.* During cross-examination it was established that Johnson had not yet been sentenced and that the

agreement on sentencing was dependent upon his testimony in Bannerman's case. *Id.* at pp. 82 – 86. Defense counsel also attempted to impeach Johnson's character with evidence that he had been sued for failing to pay child support. *Id.* at pp. 63 – 64. It was also established during cross-examination that at the time of his testimony, Johnson was almost done serving the unsuspended portion of the agreed to sentence of 4 years. *Id.* at p. 98. Johnson admitted during cross-examination that at the time of the shooting he had long hair that he wore in braids, but denied he was the shooter. *Id.* at pp. 100 – 101. Johnson was further impeached with prior convictions for marijuana possession and his admitted reputation as a person who sells drugs. *Id.* at pp. 104 – 5. The State attempted to rehabilitate Johnson during redirect by having him affirm that the plea agreement he entered into did not specify what he was supposed to say during his testimony. *Id.* at pp. 106 – 8.

Sgt. Simmons, a supervisor for the non-fatal shootings unit of the Baltimore City Police at the time of the shooting, testified that he responded to the shooting at J&J Liquors and spoke with Officer Garrett at the scene. ECF 13 at Ex. 4, pp. 115 – 137. Simmons testified that the victim, David Mitchell, was rushed to emergency surgery upon arrival at the hospital because a bullet hit his femoral artery and he was losing a lot of blood. *Id.* at pp. 120-21. Given Mitchell's grave condition, the homicide unit for Baltimore City Police was contacted regarding the case. *Id.*

Simmons is the officer who retrieved the surveillance video from inside the store. ECF 13 at Ex. 4, p. 122. Simmons viewed the video and testified that the surveillance equipment recorded the scene at a faster than normal speed making it difficult to watch. *Id.* at pp. 123 – 24. For that reason, Simmons testified that he gave the video tape cassette to Detective Bennett so he could give it to the media unit to slow down and to retrieve still photographs from the footage of

9

the shooting. *Id.*

Simmons met with Mitchell in the hospital the day after his surgery. Mitchell told Simmons that he recognized the person with the man who shot him as Orlando Johnson. ECF 13 at Ex. 4, p. 124. Simmons researched the police database and located Orlando Johnson. *Id.* at p. 125. In addition, Simmons retrieved the CCTV footage of the street outside of the store and observed a light colored SUV leaving the area after two men got into the car following the shooting. *Id.* When Johnson was arrested, he was driving an SUV that resembled the one on the CCTV footage. *Id.* Simmons further testified that when Keith James was shown a photo array containing Bannerman's picture, he identified Bannerman as the shooter. ECF 13 at Ex. 4, p. 133. Based on that identification, a search warrant for Bannerman's house was issued and later executed. *Id.* at p. 135.

During cross-examination of Simmons, defense counsel established that Kwiesi Sutton, one of Mitchell's companions, was uncooperative with police during questioning and was in fact arrested that night for drug possession. ECF 13 at Ex. 6,[4] p. 8. Mitchell's other companion, Thomas Royster, was too intoxicated to provide a statement to police. *Id.* Simmons further confirmed during cross-examination that Keith James did not initially identify Bannerman as the shooter, had only provided a basic description, and told police the shooter was wearing dark clothing.[5] *Id.* at pp. 10 – 13. Simmons was also impeached with a report written shortly after the CCTV footage was reviewed which noted that the "shooter" is seen getting into the driver-side of the vehicle, as well as a transcript of an interview with Mitchell in which he stated that the shooter was wearing dark clothing. *Id.* at pp. 29; 31 – 32. The State rehabilitated Simmons

---

[4]     Exhibit 6 is incorrectly designated as a transcript for April 25, 2009. The exhibit, however, is a transcript of proceedings that took place before those transcribed and designated as "Exhibit 5."

[5]     Bannerman was not wearing dark clothing, but Orlando Johnson is noted to be wearing dark clothing in the video footage taken both inside and outside of the store.

through redirect testimony in which Simmons indicated that Mitchell never identified Orlando Johnson, a man Mitchell knew and recognized during the incident, as the shooter. *Id.* at p. 37.

Detective Ray Bennett was assigned to investigate this case and he testified for the State. He explained that Sutton was irate on the night of the shooting because he was arrested for possession of suspected cocaine and because he was drunk. ECF 13 at Ex. 6, p. 48. Bennett further explained that Royster was also intoxicated, but he was calm in his interactions with police. *Id.* at p. 49. Bennett testified similarly to Simmons and stated that Orlando Johnson became a suspect based on Mitchell's statement that he recognized the man with the shooter as Johnson. *Id.* at pp. 67 – 69. An arrest warrant for Johnson was then obtained based on that information. *Id.* at p. 69.

Bennett met with Johnson on November 19, 2007. ECF 13 at Ex. 6, p. 70. Johnson identified Bannerman as the shooter and identified Bannerman in a photo array. *Id.* at pp. 74 and 77. Bennett acknowledged that Mitchell was unable to identify anyone in the photographic array containing a picture of Bannerman. *Id.* at p. 82. Bennett further acknowledged that on the CCTV footage, Orlando Johnson is seen going toward the driver side door wearing dark clothing and that James had stated that the shooter was wearing dark clothing. *Id.* at p. 85. Bennett further stated that based on the information he gathered during his investigation he concluded that Bannerman was the shooter and that Johnson was an accessory. *Id.* at p. 86.

During Bennett's testimony the surveillance video taken by the camera inside of the store was played for the jury. ECF 13 at Ex. 6, pp. 89 – 91. Bennett identified the people in the video, including Bannerman, over objection by defense counsel. *Id.* at p. 90. Bennett pointed out that it was not possible to tell whether Bannerman is holding a gun in the video due to the quality of the image and explained that this was why the video was given to Officer Strand of the media unit so

11

that the images could be enhanced. *Id.* Bennett also pointed out, however, that the person identified as Bannerman has his arm positioned in an "L" shape indicating he is holding something in his hand, while the person identified as Johnson is never seen holding a gun or positioning his arm or hand in such a way as to indicate he was doing so. *Id.* at pp. 91 – 92. Bennett then reiterated that Bannerman was identified as the shooter based on the information provided by Johnson and the identification made by James. *Id.* at p. 92.

On cross-examination of Bennett, he admitted that no one's face could be discerned from the surveillance video and that James did not claim to know who the shooter was until the second time he was interviewed by police. ECF 13 at Ex. 6, pp. 99 – 108. Bennett denied promising James anything in exchange for his testimony identifying Bannerman as the shooter and claimed that he was not familiar with the fact that James is addicted to drugs. *Id.* at pp. 106 and 117. Bennett admitted during cross-examination that he wrote the note indicating that the shooter was walking toward the driver-side door of the car on the CCTV footage, but he also stated that Mitchell told police several times that Orlando Johnson was not the person who shot him. *Id.* at pp. 123 – 24.

On redirect Bennett related that Mitchell had informed police that Orlando Johnson was staring at him the entire time the incident was taking place. Mitchell further confirmed that he and Johnson had dated the same girl, Martina, but not at the same time and that Mitchell did not think the shooting was related to that. *Id.* at pp. 126 – 33. Bennett was the last witness to testify on behalf of the State.

Bannerman's attorney called only one witness to testify: Dawntanya Franklin. ECF 13 at Ex. 6, pp. 138 – 39. Ms. Franklin testified that she had been Orlando Johnson's girlfriend for the past two years and that she owns a Chevy Equinox that Johnson frequently borrowed. *Id.* On

12

cross-examination Ms. Franklin affirmed that she never knew Johnson to allow a third party to drive her car when it was in his possession. *Id.* at pp. 139 – 40.

Before the State rested its case, a stipulation was read to the jury indicating that Bannerman had been convicted of an unspecified offense that made it unlawful for him to possess a handgun. ECF 13 at Ex. 5, p. 7.

Defense counsel objected to the inclusion of an instruction to the jury on aiding and abetting, arguing that the instruction implies a conspiracy which was irrelevant to the case. ECF 13 at Ex. 5, pp. 5 – 6. The court overruled the objection and rejected counsel's position stating that aiding and abetting is not a crime and that although the instruction was more applicable to Orlando Johnson, the instruction would be provided so that the jury would understand the roles of an accomplice and a principal. *Id.* at p. 6.

### Direct Appeal

Bannerman raised six claims in his direct appeal to the Court of Special Appeals: (1) did the trial court deprive Bannerman of a fair trial by repeatedly questioning witnesses in a manner that was prejudicial to the defense? (2) did the trial court err in allowing the lead detective to express his opinion that Bannerman was the person who shot the victim? (3) did the trial court err by allowing the lead detective to identify individuals seen in the surveillance footage? (4) was it plain error for the trial court to conduct voir dire of the jury pool by posing several questions at once and at the end asking if any prospective jurors had the relevant answers to those questions (5) did the trial court err in admitting the photo arrays that were shown to Keith James and Orlando Johnson by police? (6) was the evidence sufficient to support Bannerman's convictions? ECF 13 at Ex. 8, p. 2. In its May 20, 2011 unpublished opinion, the Court of Special Appeals affirmed Bannerman's convictions, rejecting all alleged errors raised. *Id.* at Ex. 10.

13

Bannerman filed a petition for writ of certiorari with the Maryland Court of Appeals following the Court of Special Appeals' decision. He raised three questions for that court to consider: (1) did the trial court deprive Bannerman of a fair trial when it repeatedly questioned witnesses in a manner prejudicial to the defense? (2) did the trial court err in allowing the lead detective to express his opinion that Bannerman was the person who shot the victim? (3) did the trial court err in allowing the lead detective to identify the individuals seen in the surveillance footage? ECF 13 at Ex. 11. The Court of Appeals denied Bannerman's request for further review on September 19, 2011.

### Post-Conviction Proceedings

Bannerman raised the following claims in his self-represented post-conviction petition, as amended: (1) Bannerman's right to confront the technician who manipulated video from a closed circuit T.V. outside the liquor store was denied; (2) trial counsel was ineffective for (a) failing to object to Detective Bennett's opinion testimony regarding a witness's truthfulness, (b) failing to object to the trial court's compound voir dire questions, (c) failing to object to the aiding and abetting jury instruction, (d) failing to file a motion for modification of sentence or a motion for three judge panel review, (e) failing to object to a juror's communication with the State's attorney, and (f) the cumulative effect of these errors; (3) the trial court erred in elevating a lay witness to the status of an expert witness; and (4) appeal counsel was ineffective for failing to assert issues on appeal. *See* ECF 13 at Ex. 14, pp. 7 – 9. A hearing on the post-conviction petition was held on February 4, 2013, and Bannerman was represented by counsel. The only witness called to testify during the hearing was Bannerman himself. *Id.* at Ex. 14.

In a written opinion dated November 18, 2013, the post-conviction court denied relief on all but one of Bannerman's claims; the only relief the court granted was an opportunity to file a

belated request for a three-judge panel review. ECF 13 at Ex. 15. With respect to the remaining claims the post-conviction court found that Bannerman failed to sustain his burden of proof and noted that where a petitioner fails to call trial counsel as a witness at the post-conviction hearing, the court is free to presume that trial counsel had a legitimate tactical reason for the actions taken. *Id* at p. 6, citing *Stovall v. State*, 144 Md. App. 711 (2002). The court also noted with respect to several aspects of Bannerman's claims regarding the effectiveness of trial counsel that even if counsel's performance had been proved deficient, Bannerman failed to show he was prejudiced by the actions or inaction. *Id.*

Bannerman appealed the post-conviction court's decision to the Court of Special Appeals, raising the following claims: the post-conviction court failed to consider his claim that it was error to issue a flight instruction; his confrontation rights were violated; post-conviction counsel was ineffective for: failing to call trial counsel as a witness at the post-conviction hearing and failing to properly argue the expert witness issue; trial counsel was ineffective for: failing to object to the trial court's voir dire of the jury, failing to object to the trial court's flight and aiding and abetting instructions to the jury, and failing to object when a juror communicated with the State's attorney. ECF 13 at Ex. 16. The Court of Special Appeals summarily denied Bannerman's application for leave to appeal in an unreported opinion dated September 23, 2014; the mandate issued on October 24, 2014. *Id.* at Ex. 17.

Claims raised in this court

Bannerman claims (1) he was denied due process because the trial judge: showed bias in front of the jury, allowed lay opinions to be considered as facts, denied Bannerman's right to confront witnesses, elevated lay-witnesses to experts, and gave an irrelevant jury instruction over objection; (2) he was denied the effective assistance of counsel when trial counsel failed to:

assert Bannerman's right of confrontation; object to a detective providing an "identifying opinion; object to confusing jury voir dire; and find out about a jury instruction on aiding and abetting; (3) the trial court abused its discretion when it did not allow time for the defense to obtain an expert witness to counter the testimony of a state witness the court allowed to give expert testimony; and (4) his right of confrontation was violated when a supervisor testified to the manipulation of video evidence when it was changed from one format to another by a non-testifying technician. ECF 1 at p. 7. Bannerman does not provide an explanation of these claims in the petition, but the claims are somewhat clarified in his reply. ECF 14.

In his first claim regarding the trial court denying him "due process," Bannerman explains that the trial court failed to "present a level playing field to allow both sides an equal ability to present their case." ECF 14 at p. 5. He further claims the trial court erred because it allowed a lay-witness to give expert testimony; presumably referencing the testimony of Officer Strand from the media unit. Bannerman further asserts that Orlando Johnson's testimony was unreliable since he testified in exchange for immunity and that "[n]othing showed Petitioner did this crime." *Id.* at pp. 5 – 6.

With respect to his claim of ineffective assistance of counsel, Bannerman asserts that "[c]ounsel simply remained mute when faced with a supervisor presenting someone else's work product at trial. Counsel simply frowned when the lead detective stated that 'this is him' while pointing to the back of a blurry image on the screen in the courtroom, as if he had known the defendant for years and would recognize him from even that viewpoint. Counsel ignored the multiple questions during voir dire, even though it . . . seemed to confuse him. . . . " ECF 14 at p. 4.

Bannerman's claim he was denied a fair trial when he was denied the opportunity to call

an expert witness in rebuttal again references the testimony of Officer Strand regarding the store's surveillance video. He claims the trial court erred when it elevated Strand "above those of the defense" and then "hinder[ed] the defense's ability to counter" that testimony. ECF 14 at p. 3. He adds that trial counsel was ineffective for failing to object to the trial court's actions. *Id.* Bannerman states, without providing the name of the witness or the nature of the testimony provided, that permitting a witness to testify as an expert when they are not listed as an expert deprives the defense of an opportunity to present an expert witness in rebuttal. He asserts that trial counsel should have "vehemently opposed this, requested a break or continuance, demanded an interrogatory (sic) appeal, or sought some other relief" and that the failure of counsel to do so renders the verdict in this case unreliable. *Id.*

With respect to his claim regarding "manipulation of evidence" Bannerman argues that under the Supreme Court's holdings in *Crawford v. Washington*, 541 U.S. 36 (2004); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2008), and *Bullcoming v. New Mexico*, _ U.S. _ , 131 S. Ct. 2705 (2011), he was entitled to cross-examine the technician who transferred the video from one format to another. ECF 14 at pp. 2 – 3. He asserts that the surveillance video shown to the jury depicts "what barely appears to be someone with a similar build as Petitioner getting into a vehicle that may or may not have been a similar make and model as that of his alleged accomplice." *Id.* at p. 2. He further states that "[t]his is the very video where it took the investigator . . . to tell the jury that one of those figures depicted on the manipulated video was none other than Petitioner, likely because even with the manipulations the jury could or would not have all found it was him without being told." *Id.* at pp. 2 – 3. Bannerman concludes that "this evidence has been tainted." *Id.* at p. 3. He further takes issue with respondents' position that *Crawford* and its progeny does not apply retroactively to cases on collateral review. *Id.*

## Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings" *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* __ U.S.__, __, 134 S.Ct 1697, 1702 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S.. at

101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable

application of federal law is different from an incorrect application of federal law." *Id.* at 785

(internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable

merely because the federal habeas court would have reached a different conclusion in the first

instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the

record might disagree about the finding in question," a federal habeas court may not conclude

that the state court decision was based on an unreasonable determination of the facts. *Id.* "[A]

federal habeas court may not issue the writ simply because [it] concludes in its independent

judgment that the relevant state-court decision applied established federal law erroneously or

incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court

shall be presumed to be correct," and the petitioner bears "the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where

the state court conducted an evidentiary hearing and explained its reasoning with some care, it

should be particularly difficult to establish clear and convincing evidence of error on the state

court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where

state courts have "resolved issues like witness credibility, which are 'factual determinations' for

purposes of Section 2254(e)(1)." *Id.* at 379.

### Analysis

Respondents correctly observe that Bannerman did not raise a federal due process claim

in either his direct appeal or his post-conviction proceedings. To the extent other aspects of the

claim were raised, he fails to establish an error warranting federal habeas relief. The issue regarding the trial judge's alleged bias was addressed somewhat by the Court of Special Appeals on direct appeal when it observed that the questions posed by the judge to various witnesses during the trial were "in the nature of clarification and . . . did not reflect a particular point of view on the part of the judge." ECF 13 at Ex. 10, p. 5. The appellate court further declined to find a basis for plain error review of the allegation after determining the alleged error was not preserved for appellate review. *Id.* at p. 6. The appellate court's analysis relied on the Court of Appeals' decision in *Diggs v. State* 409 Md. 260, 294 (2009) which Bannerman argued required reversal of his conviction. *Id.* at p. 4. Nowhere in the analysis does the court rely upon a federal due process analysis. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 503 U.S. 62, 67-68 (1991).

With regard to the credibility of Orlando Johnson's testimony, this allegation was also addressed by the Court of Special Appeals in its decision affirming Bannerman's conviction. The court observed, with regard to the sufficiency of the evidence relied upon for Bannerman's conviction, that while uncorroborated testimony of an accomplice is insufficient to support a criminal conviction, in Bannerman's case the testimony was corroborated through another witness's testimony: Keith James. ECF 13 at Ex. 10, pp. 17 – 19. The court further noted that under Maryland law, only slight corroboration is required and that James's testimony, if believed by the jury, was sufficient to corroborate Johnson's testimony. *Id.* Credibility of James's testimony is a matter left for the jury to decide. No aspect of this claim warrants federal habeas corpus relief.

Bannerman's ineffective assistance of counsel claim concerns, in part, counsel's failure to object when "a supervisor present[ed] someone else's work product at trial." ECF 14 at p. 4. This portion of Bannerman's claim appears to relate to Strand's testimony regarding the video from the CCTV camera stationed outside the store and operated by the Baltimore City Police Department. *See* ECF 14 at pp. 2- 3, *see also* ECF 13 at Ex. 3, pp. 90- 91 (testimony that CCTV belongs to Baltimore City Police). Strand's testimony about the video from inside the store related to her own work, not work done by someone she supervises. The trial transcript reveals that nothing was done to the CCTV video other than retrieving it for purposes of introducing it as evidence. ECF 13 at Ex. 3, p. 96. While the CCTV video was initially offered into evidence through Strand over defense counsel's objection, the trial court reversed itself and did not allow the video to come in through Strand because she admitted she did no work on the video. ECF 13 at Ex. 3, pp. 98- 99. The court observed that there was no harm done by the initial ruling because Strand did not say anything about the contents of the CCTV footage. *Id.* at p. 100. The post-conviction court correctly found this allegation to be "unsupported by the facts or evidence of the case." ECF 13 at Ex. 15, p. 5.

Bannerman further alleges that counsel was ineffective for failing to object when Detective Bennett identified Bannerman in the surveillance video footage. ECF 14 at p. 4. This claim was raised on direct appeal and the Court of Special Appeals found that the issue regarding Bennett's testimony was not preserved for review due to counsel's failure to object. ECF 13 at Ex. 10, pp. 10 − 12. The appellate court also observed, however, that even if the issue had been preserved it would have no merit. *Id.* at p. 12. The court stated that the jury was able to judge for itself what the video showed and whether Bennett's identification of Bannerman was accurate. *Id.* The post-conviction court noted that because Bannerman did not call trial counsel

as a witness for the post-conviction hearing, the court was free to presume that counsel's actions or failure to act were due to a sound tactical reason. ECF 13 at Ex. 15, pp. 5 – 6, citing *State v. Matthews*, 58 Md. App. 243, 245 (1984). Bannerman has failed to demonstrate that counsel's performance was deficient or that he was prejudiced by the failure to object to Bennett's testimony regarding the video.

Bannerman's claim that counsel was ineffective for failing to object to the voir dire questions posed to the jury venire was addressed on direct appeal. ECF 13 at Ex. 10, pp. 13 – 14. While the court found that the claim was not preserved for appellate review, it also found that the manner in which the trial court conducted voir dire was not objectionable. In this case, the trial court asked three to five questions before requesting potential jurors to respond. In the case where the Maryland Court of Appeals found the voir dire questions improper, the trial court asked potential jurors a list of 17 questions before potential jurors were permitted to respond. *Id.* at p. 14, citing *Wright v. State*, 411 Md. 503, 514 (2009). Bannerman has failed to demonstrate deficient performance on trial counsel's part where, as here, any objection lodged would have been overruled and would not have presented a viable basis for relief on appeal. "Neither paid nor appointed counsel may . . . consume the time and the energies of the court or the opposing party by advancing frivolous arguments." *McCoy v. Court of Appeals of Wisconsin, Dist. 1*, 486 U.S. 429, 436 (1988).

Bannerman next claims he was denied a fair trial when he was not given an opportunity to call an expert witness in rebuttal of the State's witness regarding conversion of the VHS video tape from the store surveillance camera to digital format. ECF 14 at p. 3. Bannerman's claim is without merit. The trial court granted defense counsel 48 hours after the close of the state's case to locate a rebuttal witness. Trial counsel was not present at the post-conviction hearing to

provide testimony as to why an expert was not called.[6]  Bannerman cannot sustain his heavy burden to overcome the presumption that counsel's failure to call a witness was trial strategy.

Bannerman's claim that the holding in *Crawford v. Washington*,541 U.S. 36 (2004) and its progeny requires reversal of his conviction because he was not given the opportunity to cross-examine the technician who transferred the video from one forma to another is without merit.  In addressing this claim, the post-conviction court simply noted that it was a "bald allegation unsupported by the facts or evidence of the case." ECF 13 at Ex. 15, p. 5.  As noted *supra*, Strand testified about the transfer of the video surveillance from inside the store which was work she herself performed.  Defense counsel did in fact cross-examine the technician who transferred the video and the post-conviction court's summary dismissal of this claim is without error.

### Conclusion

This court finds that Bannerman has failed to assert or offer any viable evidence to support a basis for federal habeas relief.  The petition for writ of habeas corpus shall, accordingly, be denied.

In addition to determining whether the petition before the court states a basis for relief, this court must determine if issuance of a certificate of appealability is warranted.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U. S.C. § 2253(c)(2).  The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed

---

[6]      In a bench conference with counsel, the trial judge expressed the view that locating an expert to rebut Strand's testimony regarding the transfer of the video from VHS to digital media would be difficult at best.  Counsel seemed to indicate during that conference that she could not find an expert to testify in rebuttal. ECF 13 at Ex.6, pp. 153-54.

further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. *See* 28 U. S.C.§ 2253(c)(2). A separate order follows.

_May 11, 2017_
Date

_J. Frederick Motz_
J. Frederick Motz
United States District Judge